# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

CEDRIC CARTER,

                       Petitioner,

          -vs-

BETTY MITCHELL, Warden,

                       Respondent.

           :            Case No. 1:98-cv-853

           :            District Judge Thomas M. Rose
                       Magistrate Judge Michael R. Merz

---

## POST-REMAND REPORT AND RECOMMENDATIONS

---

This capital habeas corpus case is before the Court on remand from the Sixth Circuit, *Carter v. Mitchell*, 693 F. 3d 555 (6th Cir. 2012). After the mandate issued (Doc. No. 157), the Magistrate Judge noted to the parties that he would consider the remanded issues ripe for decision unless any party expected to seek certiorari (Doc. No. 158). Neither party did and the time for doing so has expired. District Judge Rose has confirmed that the case continues to be referred to the undersigned Magistrate Judge (Doc. No. 162). Neither party has requested to submit any additional briefing on the remanded issues. Thus the case is ripe for decision on the remanded issues.

This Court had denied all fifty claims in Carter's Petition, either on the merits or as procedurally defaulted (Doc. No. 137, adopting Report and Recommendations on the merits (the "Report") Doc. No. 129). This Court granted a certificate of appealability on Ground for Relief 27, but the Court of Appeals affirmed our decision dismissing that claim on the merits. *Carter*, 693 F.3d at 563.

1

The Sixth Circuit expanded the certificate of appealability to include the question whether this Court properly dismissed Grounds for Relief Twenty-Eight and Twenty-Nine (ineffective assistance of trial counsel) and Fifty (ineffective assistance of appellate counsel) as procedurally defaulted.  *Id.* at 561.  It concluded that we had correctly done so as to Ground Fifty, but had erred in doing so as to Grounds Twenty-Eight and Twenty-Nine. *Id.* at 569[1].  The case was remanded "for the district court to consider whether Carter is entitled to a writ of habeas corpus based on counsel's performance at the penalty phase of the trial or the trial court's exclusion of evidence at the mitigation stage." *Id.*  In particular, the Circuit Court directed us "to determine in the first instance whether Carter is entitled to the writ based on his counsel's performance at the mitigation stage of the proceedings."  693 F. 3d at 563.

**Grounds for Relief Twenty-Eight and Twenty-Nine As Pled**

Grounds Twenty-Eight and Twenty-Nine, as pled in the Petition, read:

<u>**TWENTY-EIGHTH CAUSE OF ACTION**</u>

**Petitioner's sentence of death is void or voidable because he was denied effective assistance of counsel in the preparation and presentation of the mitigation phase of his capital trial in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution**.

122.   In the landmark case of *Strickland v. Washington,* 466 U.S. 667 (1984), the Supreme Court held that in order to establish a claim of ineffective assistance of counsel, a Petitioner must show that his/her counsel made such serious errors that he/she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and that counsel's deficient performance prejudiced the defense by

---

[1] Judge Sutton dissented from the procedural default ruling on Grounds Twenty-Eight and Twenty-Nine. *Carter*, 693 F.3d at 570-72.  The majority opinion is, however, the law of the case, binding on this Court on remand.  Thus no re-analysis of the procedural default arguments will be undertaken here.

undermining the trial result. Under the first prong of the *Strickland* test, a Petitioner must demonstrate that his counsel's performance fell below an objective standard of reasonableness based upon all of the circumstances surrounding the case. See *Id.*. at 688. Judicial scrutiny of counsel's performance m u s t be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsel's perspective at the time of the conduct. *Id.* at 689. In determining whether or not counsel's performance was deficient, the Court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. See *Id.*

123. In order to satisfy the second "prejudice" prong of the *Strickland* test, a Petitioner must show that a "reasonable probability" exists that, but for his counsel's errors, the result of the trial would have been different. See *Id .* at 694. A showing by this Petitioner that the alleged errors in the mitigation phase of his trial had "some conceivable" effect on the outcome of the proceeding is sufficient to meet this standard. See *Id .* at 693. However, by the same token, this Petitioner need not demonstrate that his counsel's conduct "more likely than not" altered the trial's outcome in order to establish prejudice. See *Id.* This Petitioner will meet his burden if he shows that the decision reached by the jury during the mitigation phase of his trial would "reasonably likely have been different absent the errors." See *Id.* at 695. See also *United States v. Cordell,* 924 F.2d 614 (6th Cir. 1991); *United States v. Wirsing,* 719 F.2d 859 (6th Cir. 1983); and *Linton v. Perini*, 656 F.2d 207 (6th Cir. 1981), *cert. denied*, 454 U.S. 1162 (1982).

124. Our own Sixth Circuit Court of Appeals reversed a death penalty sentence when it found that counsel had made virtually no attempt to prepare and present effective mitigation at the sentencing phase of the trial. *Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995). In a matter remarkably similar to the matter at bar, the court recognized that "it was obvious, or should have been, that the sentencing phase was likely to be 'the stage of the proceedings where counsel can do his or her client the most good.'" In accord with *Kubar v. Thieret*, 867 F. 2d 351, 369 (7th Cir.) *cert. denied*, 493 U.S. 874 (1989). In the *Glenn* case counsel failed to make any significant preparations for the sentencing phase. This was

particularly egregious because there was a significant medical history which showed that Glenn had a neurological brain impairment. Since Glenn's counsel failed to make any preparations for the sentencing phase until after the guilty finding, the court found such inaction to be objectively unreasonable. "To save the difficult and time consuming task of assembling mitigation witnesses until after the jury's verdict in the guilt phase almost insures that witnesses will not be available." Citing *Blanco v. Singletary*, 943 F.2d 1477, 1501-02 (11th Cir. 1991), *cert. denied*, 504 U.S. 943 (1992). The court found that only one of Glenn's attorney's [sic] did any preparation at all for the mitigation phase, and his efforts were largely misdirected. He attempted to prepare a video tape which tried to show a day in the life of the defendant.

125. The trial court held such evidence to be inadmissible, so that in fact very little if any mitigation was presented. The Court concluded that there was a wealth of evidence present which showed Glenn's brain damage, his unfortunate proclivity to follow, and numerous individual's [sic] who were willing to come forward on his behalf. The similarities to the instant matter are striking.

126. Trial counsel's initial error in the matter at bar, was the failure to obtain a mitigation expert. Instead, counsel requested the appointment of a psychologist from the local court clinic. Dr. David Chiappone, while an adroit psychologist, had virtually no experience in the preparation and presentation of mitigation material in a death penalty case. (Sentencing Hearing, p. 1217). Furthermore, the Ohio Public Defender has long provided mitigation specialists to assist appointed counsel in the long and grueling gathering of information that becomes a biography of the accused's life. Dr. Chiappone simply scratched the surface of what should have been presented.

127. Petitioner's history disclosed that he is borderline mentally retarded. (Sentencing Hearing p. 1199). Furthermore, Dr. Chiappone opined that Petitioner had had a number of head injuries which led him to believe that there may have been a neurological impairment. "I think we have to raise the issue of organic involvement meaning some dysfunction in the brain that is not entirely clear what is going on." (Sentencing Hearing p. 1203). Unfortunately no effort was made to acquire a cat-scan or other neurological examinations to present the existence or nonexistence of an organic reason for Petitioner's behavior.

128. Petitioner's school records from Selma, Alabama were partially made available to Dr. Chiappone. These records disclosed that national testing had been performed on Petitioner. These tests serve as a strong indicator of a student's mental proclivities and accurately predict retardation, attention deficits, anti-social behavior and overall ability to learn. No expert in education was consulted or asked to interpret the score available. Since these tests are nationally given, a local education expert would certainly have been available to discuss the interpretation of the scores.

129. Petitioner's formative years were spent in Selma, Alabama. No effort was made to talk with his teachers or the school officials to confirm the ongoing problems he was experiencing. A wealth of information was available to be obtained from these individuals and telephone depositions could have been taken to preserve their testimony for the trial.

130. Another underlying theme in Petitioner's development was his addiction to drugs at a very early stage in his life. Although familiar in a very general sense with the effects of cocaine on an individual, an expert in this area could have provided a more thorough understanding of the impact of cocaine on this Petitioner.

131. While the trial was proceeding, Petitioner apparently had a Social Security claim wending its way through the system. A social security claim will by necessity require a variety of physical and mental examinations in order for the claimant to obtain benefits. (Post-conviction Petition Exh. B). That document reflects that doctors and other trained personnel decided that Petitioner was disabled. Further, it reflects Social Security's understanding that his condition may not improve. It certainly would have been essential to the mitigation phase to provide this very valuable information to the jury.

132. Counsel for Petitioner failed to obtain psychiatric records for treatment that Petitioner had undergone as a child. (Mitigation Hearing p. 1197). Present counsel can only conjecture on what would have been contained within these records, but surely the failure to obtain them is not justifiable.

133. Petitioner's family was not called to the stand to recount to the jury the problems that he had while growing up. To argue that such testimony would have been cumulative shows a lack of understanding of the process of mitigation. Petitioner's mother was not called to the stand although she stood ready to appear.

5

(Post conviction Petitioner Exh. C) Testimony during the trial reflected the existence of a sister and a brother as well. None of these individuals were called to plead for Petitioner's life. Instead, counsel opted for a summary of interviews obtain by Dr. Chiappone and his assistant. This sterile and disjointed approach to mitigation gave the jury nothing to hold onto.

134. Dr. Chiappone's presentation was less than effective. On numerous occasions he had to be told to speak up so that the jurors could hear his testimony. (Mitigation Hearings pps. 1182, 1189, and 1190). In addition his testimony was extremely difficult to follow and his conclusions equally confusing. (Post conviction petition Exh. B. Statement of R. Michael Reinstatler, Juror Foreman).

135. In applying the above to the matter at bar, the actions of Petitioner's counsel from beginning to the end of the mitigation phase constituted ineffective assistance. Even if we assume that Dr. Chiappone's diagnosis of Petitioner as borderline mentally retarded. With possible organic dysfunction in the brain, substance dependent, and an anti-social personality were accurate, trial counsel did little to effectively present this to the jury. Trial counsel should have investigated these issues with Petitioner's family members and friends to enable Dr. Chiappone to present his testimony in the best light possible. Similarly, Petitioner's mother should have been called and engaged in a lengthy conversation about her son's upbringing.

136. In addition, trial counsel gratuitously elicited information about Petitioner's dark side. Petitioner was revealed by his own witness to be abusive toward women, a bully who brutally imposed his will on those in the streets, a person who had difficulty controlling his anger, a person fascinated with guns, and finally as someone who tortured and killed animals. (Mitigation Hearing pps. 1191, 1193, 1223). Disclosure of these tendencies could only have frightened the jury and justified their verdict. By providing this type of information, trial counsel for Petitioner included non-statutory aggravating factors to be considered by the jury.

137. Dr. Chiappone also disclosed that Petitioner engaged in self-mutilation. (Mitigation Hearing p. 1193). People who self mutilate may possess suicidal ideation and some believe that it may be indicative of sexual abuse as a child. None of this was addressed in other than cursory fashion at the hearing and certainly was not a factor in Dr. Chiappone's conclusions.

6

138.   Without the necessary testimony and background from friends and family members, the jury could only look to Dr. Chiappone for such information.  As a result, Dr. Chiappone was not effective and was successfully attacked by the prosecutor.  In its written opinion sentencing Petitioner to death, the court was less than impressed with Dr. Chiappone's efforts.  In one sentence the Court opines that while Petitioner's upbringing may not have been exemplary, it did not explain his later behavior in life. (Opinion of Judge Norbert Nadel p. 15).

139.  In *Glenn* the Court noted that the reason for the paucity of mitigation evidence was the lack of preparation.   The Court observed:

> The lawyers made no systematic effort to acquaint themselves with their client's history.  They never spoke to any of his numerous brothers and sisters.  They never examined his school records.  They never examined his medical records (including an emergency room record prepared after he collapsed in court one day) or records of mental health counseling they knew he had received. They never talked to his probation officer or examined his probation records.  And although they arranged for tests, some months before the start of the trial, to determine whether he was competent to stand trial, they wait until after he had been found guilty before taking their first step – or misstep as we shall explain presently – toward arranging for expert witnesses who might have presented mitigating evidence on John Glenn's impaired brain function.

In addition, Glenn's counsel did not seek to obtain defense experts of their own to present evidence on their client's impaired brain function.  Instead they allowed the court to appoint joint experts whose results were given to the jury.  These reports were of no benefit to Glenn and went into the jury room without being questioned.  The Sixth Circuit held that no competent trial counsel would have allowed this to occur.  If counsel had done their homework ahead of time Glenn's interests would have been better protected.  The instant case is no different.

140.  Finally, counsel for Petitioner was ineffective in the closing argument of the mitigation phase.  The closing argument is what ever [sic] good defense lawyer lives for.  Defense counsel must evoke knowledge and facility with the governing law and facts at

issue. Mitigating factors raised throughout the proceedings must be forcefully recapitulated. A clear explanation of the statutory weighing process, with emphasis on the weight of evidence in mitigation must be made.

141. During the course of his closing argument, defense counsel provided a disjointed and repetitive narrative. Since the preparation and presentation of the mitigation lacked cohesion, the necessary experts and required volume of information, the closing argument could not hope to rise above the overall lack of effort and thought which went into it.

142. All of the errors alluded to above more than meet the first prong of the *Strickland* test that counsel's performance was deficient. The combination and cumulative effect of these errors undermined the reliability of the death sentence imposed. Defense counsel's efforts undermined the process and severely reduced Petitioner's chances for a life sentence. This prejudice was sufficient to meet the second prong of the *Strickland* test.

143. In sum, the total effort and presentation of defense counsel during the mitigation phase of this trial was ineffective under the *Strickland* decision. This court should determine that the sentence of death was inappropriate and that counsel's efforts fell below the standard now recognized.

## TWENTY-NINTH CAUSE OF ACTION

**Petitioner's death sentence is void or voidable because evidence which should have been presented to the jury was excluded due to the ineffectiveness of trial counsel in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

144. The United States Supreme Court has consistently held fast to the theme that mitigating evidence should not be precluded. The Eighth Amendment requires that a capital sentence "be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." *Jurek v. Texas*, 428 U.S. 262, 271 (1976). In *Lockett v. Ohio,* 438 U.S. 586, the Chief Justice wrote that the Eighth Amendment and *Jurek* require,

> that the sentence, in all but the rarest kind of capital case, not be precluded form considering as a mitigating factor, any aspect of a defendant's character or record and any of

8

the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Id.* at 604.

145.  As discussed in the Cause of Action above, trial counsel's lack of effort in the preparation of the mitigation phase of the trial, excluded viable and effective information from being presented to the jury.

146.  A failure by trial counsel to actually investigate his options regarding presentation of mitigating circumstances, and failure to make thoughtful, strategic choices, is objectively unreasonable. *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991), *cert. denied*, 503 U.S. 952 (1992).  For these reasons Petitioner's death penalty is void.

(Petition, Doc. No.1,  pp. 37-46.)

## Scope of the Issues on Remand

In its decision in this case, the Sixth Circuit recognized the general rule that claims presented in habeas must be the same claims that were presented to the state courts.

"To fairly present a claim to a state court a petitioner must assert both the *legal* and factual basis for his or her claim." *Williams,* 460 F.3d at 806; *see Clinkscale,* 375 F.3d at 437. In order to satisfy this requirement, and avoid a procedural default, the petitioner's federal habeas petition must be based on the same theory presented in state court and cannot be based on a wholly separate or distinct theory. *Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998). For example, in *Wong*, one of the grounds the petitioner asserted in support of her petition for habeas relief was based on allegations that she had received constitutionally ineffective assistance of counsel. *Id.* at 319. In the state court proceedings Wong had alleged only that counsel's performance was deficient for failing to pursue an insanity defense. *Id.* at 319. However, in federal court, Wong additionally alleged that counsel was constitutionally ineffective for neglecting to undertake additional investigation into whether an alternate expert might have concluded that she was legally insane. *Id.* at 321. This Court held that the portion of the

> claim based on not undertaking a complete investigation was procedurally defaulted because Wong had not presented it to the state courts. *Id.* at 322; *accord Williams,* 380 F.3d at 968 (holding that petitioner's claims to the state courts alleging prosecutorial misconduct in improperly vouching for the credibility of a witness were insufficient to preserve claims based on other instances of prosecutorial misconduct).

*Carter*, 693 F.3d at 568-569.

Applying *Wong*, the Court went on to note that Carter's 28th and 29th claims as pled were

broader than what he had presented to the state courts:

> In his petition for habeas corpus to the federal district court, Carter's twenty-eighth ground for relief asserts that he was denied the effective assistance of counsel at the mitigation phase of his trial. The claim goes into some additional detail about the deficiencies of Dr. Chiappone's testimony and how, in Carter's view, it was caused by his failure to perform a diligent inquiry into Carter's background. Additionally, Carter also specifically raises as part of this ground for relief counsel's failure to have his mother testify. Similarly, Carter's twenty-ninth ground for relief raises the issue of counsels' ineffectiveness leading to the exclusion of evidence from the mitigation stage and, specifically, the trial court's refusal to provide the jury with a transcript of Dr. Chiappone's testimony.

*Carter*, 693 F.3d at 569.

Thus the facial breadth of these claims as pled in the Petition is narrowed by the Sixth

Circuit's reading of what was fairly presented to the Ohio courts.  It held:

> Carter's twenty-eighth and twenty-ninth grounds for relief were fairly presented to the state courts and are not based on new or distinct theories **insofar as they relate to the preparation of Carter's mitigation expert and the failure of Carter's mother to testify at his mitigation proceedings.** [Emphasis added.] On direct appeal to the Ohio Court of Appeals, Carter asserted in Assignment of Error X that:
>
> THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF DEFENDANT-APPELLANT IN ENTERING A SENTENCE OF DEATH WHEN DEFENDANT-APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF

COUNSEL UNDER THE UNITED STATES CONSTITUTION, AMENDMENT VI.

Issue 1. Has an accused been given effective assistance of counsel when his defense attorneys, in the penalty phase, elicit testimony from a mitigation expert when said testimony, taken as a whole, is very unfavorable to the accused?

Issue 2. Has an accused been given effective assistance [of] counsel when his attorneys, lacking much in mitigatory evidence, fail to have the accused's mother testify on his behalf?

Similarly, Carter presented these issues in his direct appeal to the Ohio Supreme Court as Propositions of Law number X and XI. And, Carter raised these issues again in his petition for post-conviction review as his Sixth, Ninth, and Eleventh Causes of Action.

In his petition for habeas corpus to the federal district court, Carter's twenty-eighth ground for relief asserts that he was denied the effective assistance of counsel at the mitigation phase of his trial. The claim goes into some additional detail about the deficiencies of Dr. Chiappone's testimony and how, in Carter's view, it was caused by his failure to perform a diligent inquiry into Carter's background. Additionally, Carter also specifically raises as part of this ground for relief counsel's failure to have his mother testify. Similarly, Carter's twenty-ninth ground for relief raises the issue of counsels' ineffectiveness leading to the exclusion of evidence from the mitigation stage and, specifically, the trial court's refusal to provide the jury with a transcript of Dr. Chiappone's testimony. Therefore, because these claims were raised through a complete round of Ohio's appellate process, they are not procedurally defaulted. Because the district court erred in concluding otherwise, we remand the matter to the district court for it to consider the merits of these claims in the first instance and whether either entitles Carter to a writ of habeas corpus.

*Carter*, 693 F.3d at 569.

Thus this Court's decision on the remanded issues is limited to those claims the Sixth Circuit found were fairly presented to the state courts. It does not include, for example, the claim that counsel's rhetorical effort in closing argument was below standard (Petition, ¶¶ 140-141) or the failure to obtain a mitigation expert (*Id.* at ¶ 126) or the failure to offer proof that persons

who self-mutilate "may possess suicidal ideation . . . [or] that it may be indicative of sexual abuse as a child" *Id.* at ¶ 137.

**Standard of Review to be Applied to Remanded Issues**

When a habeas court decides a constitutional claim on the merits, its standard of review is *de novo* if the state courts did not decide the merits. On the other hand, if the state courts decided the merits, we must defer to their decision unless it was contrary to or an "objectively unreasonable" application of clearly established United States Supreme Court precedent. *Bell v. Howes,* ___ F.3d ___, No. 11-1046, 2012 WL 6600364 *5, 2012 U.S. App. LEXIS 25851 (6th Cir. Dec. 19, 2012), *quoting Williams v. Taylor,* 529 U.S. 362, 409 (2000); see also 28 U.S.C. § 2254(d)(1); *Harrington v. Richter,* 562 U.S. ___, 131 S.Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 141 (2005); *Bell v. Cone,* 535 U.S. 685, 693-94 (2002).

**The State Court Decisions on the Remanded Issues of Ineffectiveness with Respect to (1) Dr. Chiappone's Testimony and (2) Failure to Call Carter's Mother as a Witness**

As the Sixth Circuit found, Carter's claim about ineffectiveness in presenting Dr. Chiappone's testimony was presented first on direct appeal to the Ohio Court of Appeals[2] for the First Appellate District which held:

> Carter alleges that he was denied the effective assistance of counsel as a result of five different actions or inactions of defense counsel during the guilt and penalty phases of the trial. [Including, as to the penalty phase]:

---

[2] Because the murder of Frances Messenger occurred before January 1, 1995, the direct appeal was in the first instance to Ohio's intermediate court of appeals. For capital offenses after that date, the appeal is directly to the Ohio Supreme Court.

(4) eliciting unfavorable testimony from a mitigation expert during the penalty phase of the trial;

(5) failure to have Carter's mother testify at trial.

In order to sustain a claim of ineffective assistance of counsel, an appellant must demonstrate that counsel's representation fell below an objective standard of reasonableness and that he was prejudiced as a result of his counsel's actions or inaction. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052. The United States Supreme Court recently revisited the prejudice component of the Strickland test in *Lockhart v. Fretwell* (1993), 506 U.S. 364, ----, 113 S.Ct. 838, 843. There, the lead opinion held that a showing of prejudice requires more than demonstrating that the outcome of the trial would have been different but for counsel's error. The appellant must also show that "counsel's performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. at ----, 113 S.Ct at 844. In examining the actions of trial counsel, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065. *See, also, State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

* * *

Carter also claims that he was prejudiced when trial counsel elicited unfavorable testimony from a mitigation expert during the penalty phase of the trial. While we agree that many of the statements made by the expert did not cast Carter in a positive light, the testimony, when considered in its entirety, demonstrated that Carter had lived, at times, a painful and tragic life. Defense counsel obviously hoped that such information would convince the jury that Carter's actions were a result of social and mental problems that he had experienced during his life. In our view, therefore, defense counsel acted competently and in the best interest of Carter.

In his final claim, Carter maintains that defense counsel should have had his mother testify during the trial. Without knowing what testimony might have been given, we are unable, based upon the state of this record, to say that trial counsel erred when he failed to call Carter's mother as a witness at the trial. Her testimony may have been unfavorable to Carter's defense or it may have conflicted with other testimony that was presented to the jury.

> Based upon our review of the record, we are not persuaded that trial counsel's representation of Carter fell below an objective standard of reasonableness or that Carter was afforded a trial that was unreliable or fundamentally unfair. Assignments of error two, three and ten are, therefore, overruled.

*State v. Carter*, No. C-920604, 1993 WL 512859 *15-16 (Ohio App. 1st Dist. Nov. 3, 1993).

Carter persevered on these two claims in the Ohio Supreme Court which affirmed.

Having repeated the *Strickland* standard, it held in summary fashion:

> Carter claims that ineffective assistance of his trial counsel is demonstrated by (1) counsel's failure to file a Crim.R. 13 motion to consolidate his trial with that of Hill and Sims, and to subpoena Hill to testify; (2) counsel's failure to obtain a firearms expert to provide testimony reinforcing Carter's contention that he lacked intent to kill; (3) counsel's presentation of a clinical psychologist during the mitigation hearing whose testimony was mixed in nature and included recitation of facts prejudicial to Carter; and (4) counsel's failure to call Carter's mother to testify during the mitigation hearing. None of these alleged deficiencies rises to the level of prejudicial deficient performance, nor otherwise meets the ineffective assistance of counsel criteria set forth above.

*State v. Carter*, 72 Ohio St. 3d 545 ¶ 29 (1995).

Carter then reiterated the claim about his mother's testimony as part of his petition for post-conviction relief under Ohio Revised Code § 2953.21. The First District Court of Appeals decided this claim as follows:

> Carter contended in his ninth claim for relief that he was denied the effective assistance of counsel when defense counsel "exclude[d]" his mother and his mother's live-in boyfriend from the courtroom during the trial and failed to call his mother to testify as a witness during the penalty phase of the trial. He offered in support of the claim the affidavit of his mother, who attested to the specifics of her exclusion from the courtroom and to the substance of her testimony in mitigation had she been called to testify.
>
> [Ruling on witness exclusion claim not repeated because not a remanded issue.]

Nor are we persuaded by the challenge to defense counsel's performance predicated upon counsel's failure to call Carter's mother to testify during the penalty phase of the trial. In her affidavit, Carter's mother offered the substance of her testimony in mitigation had she been called to testify. The essence of her proposed testimony regarding Carter's developmental, educational, interpersonal, and substance-abuse problems was presented through Carter's unsworn statement and the testimony of the other mitigation witnesses. Thus, the evidentiary material offered in support of this aspect of Carter's ninth claim for relief does not raise a reasonable probability that, but for this omission of counsel, the result of the penalty phase of the trial would have been different. See *Bradley, supra*, paragraph three of the syllabus.

Based upon the evidence of record and that submitted on the claim, we conclude that Carter has failed to demonstrate that defense counsel violated an essential duty in counseling adherence to the separation order or that counsel prejudiced him by failing to elicit mitigation evidence from his mother. We, therefore, hold that the common pleas court properly denied Carter's ninth claim for relief without an evidentiary hearing.

*State v. Carter,* No. C-960718, 1997 WL 705487 *6-7 (Ohio App. 1st Dist. Nov. 14, 1997)

## The State Court Decision on the Remanded Issue of the Transcript of Dr. Chiappone's Testimony

Carter presented this claim on direct appeal as an instance of trial court error, not ineffective assistance of trial counsel. The court of appeals decided the claim is as follows:

Carter, in his seventh assignment of error, alleges that the trial court committed error when it refused to provide the jury with a transcript of the testimony of Dr. David Chiappone, a clinical psychologist and mitigation expert called by Carter during the penalty phase of his trial. Carter maintains that before the jury could properly rule on whether to recommend the sentence of death, the trial court had a duty to provide each juror with information that might have resolved questions and uncertainties about testimony or any other aspect of the case. This assignment is overruled.

The trial court's response to the jury's request was as follows:

15

> [O]ur policy is that the proceedings from which this testimony came from is a sentencing proceeding which was a relatively short proceeding and, therefore, our policy is not to give you or reread testimony. The reason is it emphasizes-first of all, it was a short proceeding. It took place on Monday a short time ago and, secondly, it places an unfair emphasis to you on one part of the testimony as opposed to another. So for that reason I will not reread the testimony.

T.p. 1313-1314.

> "After jurors retire to deliberate, upon request from the jury, a court in the exercise of sound discretion may cause to be read all or part of the testimony of any witness * * *." *State v. Davis* (1991), 62 Ohio St.3d 326, 340, 581 N.E.2d 1362, 1375; *State v. Berry* (1971), 25 Ohio St.2d 255, 267 N.E.2d 775, paragraph four of the syllabus.

> In his brief on appeal, Carter argues, almost exclusively, that Chiappone's testimony was a disaster for the defense and that his opinion obliterated any mitigating evidence heard by the jurors.FN2 It is difficult to comprehend, therefore, why Carter would want such negative testimony reinforced in the minds of the jury or, for that matter, how he was prejudiced by the trial court's refusal to reread that portion of the testimony. In fact, the trial court may have reasonably concluded that Chiappone's statements were inflammatory and that a second reading of his testimony would be detrimental to the presentation of Carter's case in mitigation. In any event, we are unable to say, based on the record before us, that the trial court abused its discretion when it refused the jury's request to reread Chiappone's testimony.

> > FN2. Chiappone stated, inter alia, that Carter was a bully; that he tortured and killed animals when he was a child; that he had a fascination with guns; and that he was lazy and did not wish to follow the rules imposed by civilized society.

*Carter*, 1993 WL 512859 at *11.

Carter persevered with this claim on further appeal to the Ohio Supreme Court which

held:

## Failure to Provide Transcript of Psychologist Testimony

[34] On the second day of its deliberations concerning the penalty recommendation, the jury requested that it be provided with a transcript of the testimony of the psychologist who testified in Carter's behalf at the mitigation hearing. The trial court refused to provide such a transcript. We are called upon to review this refusal pursuant to an abuse-of-discretion analysis. *See State v. Berry* (1971), 25 Ohio St.2d 255, 54 O.O.2d 374, 267 N.E.2d 775, paragraph four of the syllabus ("After jurors retire to deliberate, upon request from the jury, a court in the exercise of sound discretion may cause to be read all or part of the testimony of any witness * * *."). *See, also, State v. Davis, supra,* 62 Ohio St.3d at 340, 581 N.E.2d at 1375. Because defense counsel did not object to the trial court's refusal to provide the transcript, reversal on the basis of this proposition would require a finding of plain error.

[35] We do not find on this record that the trial court abused its discretion in refusing to provide a copy of the transcript, and certainly do not find plain error. Carter argues that the court's refusal prejudiced him in that it was likely that the jury remembered only the vivid and negative aspects of the psychologist's testimony, e.g., that the defendant's history included sadistic behavior, and that the jury asked for the transcript so that it might have an opportunity to review the more technical, and favorable, portions of the psychologist's testimony. This contention is purely speculative, and constitutes much too thin a reed to support reversal of Carter's death sentence.

*Carter*, 72 Ohio St. 3d 545 at ¶¶ 34-35.

Carter continued to press the failure to provide the transcript claim in post-conviction as

his eleventh claim for relief.  The Court of Appeals decided the claim as follows:

In his eleventh claim for relief, Carter challenged the trial court's refusal to accede to the jury's request, during its deliberations, for a transcript of the testimony of a clinical psychologist called by the defense to testify during the penalty phase of the trial. In support of his claim, Carter offered evidence *dehors* the record in the form of the deposition of the jury foreman. The foreman testified in his deposition that the jury had requested a written transcript of the psychologist's testimony to aid in its deliberations, because the

17

jurors had experienced some difficulty in hearing and understanding the psychologist's testimony at trial, due to deficiencies either in the courtroom's transmission equipment or in the witness's manner of presentation.

The submission of evidence *dehors* the record in support of a postconviction claim will not preclude the application of the doctrine of *res judicata* to deny the claim, when the claim could fairly have been determined on direct appeal from the judgment of conviction, based upon information contained in the trial record. *Cole, supra*, syllabus; *Perry, supra*, paragraph nine of the syllabus; *State v. Mills* (Mar. 15, 1995), Hamilton App. No. 930817, unreported.

The record of the proceedings at trial demonstrates that, at various points in the psychologist's testimony, jurors' complaints regarding audibility prompted the trial court to admonish the witness to raise his voice, to adjust his posture relative to the microphone, and to repeat portions of his testimony. The Ohio Supreme Court, in the direct appeal taken by Carter from his judgment of conviction, addressed the challenge presented by Carter in his eleventh claim for relief and concluded that the trial court did not abuse its discretion in refusing to provide the jury with a transcript of the psychologist's testimony to aid in its deliberations. *Carter, supra* at 560, 651 N.E.2d at 978.

The jury foreman's deposition submitted by Carter in support of his eleventh claim for relief contains no suggestion that the foreman would have voted against recommending the imposition of the death penalty had he been given an opportunity to review a transcript of the psychologist's testimony during deliberations. The deposition, instead, established nothing more than what the trial record amply demonstrated. We, therefore, hold that Carter's eleventh claim for relief was subject to dismissal under the doctrine of res judicata, when the claim could have been, and was in fact, fairly determined on direct appeal without resort to evidence *dehors* the record.

*Carter*, 1997 WL 705487 at *4-5.

In sum, the Ohio courts decided all of the remanded issues on the merits.  This Court therefore reviews the merits in light of AEDPA deference.

On Carter's Motion, this Court conducted an evidentiary hearing October 20, 2005, and

thereafter set a schedule for briefing on the merits (Briefing Schedule, Doc. No. 118). Petitioner's arguments in his Trial Brief (Doc. No. 124) and Reply Brief (Doc. No. 128) may thus be taken as his final statements on the merits of these remanded issues.

Of course, long after the Magistrate Judge conducted the evidentiary hearing and filed the Report in 2006, the United States Supreme Court decided in *Cullen v. Pinholster,* 563 U.S. ___, 131 S.Ct. 1388 (2011), that a federal court's review of a state court decision under 28 U.S.C. § 2254(d)(1) is strictly limited to "review of the state court record," and that evidence acquired through use of an evidentiary hearing may not be considered. *Id.* at 1399. Therefore Petitioner's arguments in his Trial Brief must be construed by distinguishing what was already in the state court record and what was added to the record in this Court[3].

Carter's argument in his Post-Hearing Brief is made directly on the merits of Grounds Twenty-Eight and Twenty-Nine, as if there were no question of AEDPA deference and this Court were considering the merits *de novo*.  In addition, much of the argument is premised on evidence introduced in this Court, which the Court is prohibited by *Pinholster* from considering. The entire argument on these two Grounds made in the Trial Brief (Doc. No. 124) is reproduced in the Appendix to this Report. No additional argument on either Ground for Relief is made in the Reply Brief (Doc. No. 128).  This Court must then conduct its review under 28 U.S.C. § 2254(d)(1) without the assistance of much argument from Petitioner.

---

[3] Because this case had become final in this Court and appealed to the Sixth Circuit long before *Pinholster* was decided, habeas counsel had no occasion to attempt a successive post-conviction petition in the state courts to present the evidence acquired in federal court.  No such request has been made since this Court re-acquired jurisdiction by issuance of the mandate October 31, 2012 (Doc. No. 157).

**Merits Analysis on Claim of Ineffectiveness in Use of Dr. Chiappone**

The first of the remanded issues is whether trial counsel provided ineffective assistance in their use of expert witness David Chiappone.

Dr. David Chiappone[4] is a clinical psychologist who testified at the mitigation phase of Carter's trial.  The asserted mispresentation of this testimony is the focus of the first remanded issue.

Dr. Chiappone testified that Carter grew up in a blended family; his father was not available from early on; his relationships with all family members had been strained; his father had been physically abusive and was quite angry toward Carter thinking that Carter was not his son; Petitioner's mother used corporal punishment, hitting him with a belt if he misbehaved; his mother encouraged him to fight with peers when he was having problems with them; Carter's sister's boyfriend introduced him to drugs at about age thirteen; basically Petitioner's life in the past several years had been one of abusing drugs.  Carter had few friends through school and he was teased and called retarded, dumb, stupid.  Carter is an individual of limited intellectual ability and a slow learner; he did not do all that bad academically from kindergarten until about the sixth grade, but by age thirteen he was using drugs, his grades dropped precipitously, and he was being truant.  Carter left school at age sixteen. Vocationally, Carter had not been involved with much work experience.  As a youngster, Carter was into burning animals, would shoot a BB gun at animals, and use firecrackers to hurt animals.  Carter had also been physically abusive towards other people.  Carter's mother described him as being a troubled youngster, hard to understand, impulsive, and clumsy.  A neighbor in Selma, Alabama, where Carter grew up, said

---

[4]  Throughout his pleadings in state court as well as this Court, Mr. Carter refers to psychologist Dr. Chiappone. The trial transcript reflects that the name of the psychologist is spelled "Chapone". See, Trial Tr. A 1178. To maintain consistency, this Court will refer to Dr. Chiappone.

she believed he felt unloved. Carter's aunt and grandmother described him as being oppositional and dominating, a bully; other family members described him as easily influenced by others. (Trial Tr. 1178-1200).

Carter's medical records indicate he was slow in some developmental milestones. He grew up in a family setting in which he did not receive appropriate protection and his history of various injuries makes it clear he had not been taken care of. Testing indicated that Carter is of borderline mental retarded intellectual ability and that he possibly has a learning disorder. *Id.* Dr. Chiappone also testified that Carter has an impulsive style; his diagnoses would be borderline mentally retarded, some organic dysfunction in his brain, substance dependent in that he was abusing several substances, and anti-social personality. Carter has used at one time or another in his life crack cocaine, marijuana, alcohol, powered cocaine, Valium, and anti-depressants; his drug use started at age thirteen and that was when he started having difficulties especially academically. Carter described himself as being influenced by Kenny Hill, a co-defendant. *Id.*

Dr. Chiappone testified Carter's use of cocaine at the time of the offense would have made him more impulsive and want to act out. At the time of the offense, Dr. Chiappone believed, Carter had a defect which was his limited intellectual ability. Carter was only nineteen years old at the time of the offense. He had no record as a juvenile delinquent and two charges as an adult, but he had been getting into fights and difficulty with relationships from early on. The biggest factors in his life and actions are drugs and colonization with that sense of not fitting in and being alienated. *Id.* 1201-13. In addition, Dr. Chiappone testified that Carter has a limited ability with respect to reading and writing; his brother Robert took him into his home to try to get him away from drugs and Robert had a very difficult time getting Carter to do anything. Dr.

Chiappone believed that there is information indicating that Carter was malingering. *Id.* at 1214-

29.

       In reviewing this testimony on direct appeal, the Court of Appeals agreed that trial

counsel

> elicited unfavorable testimony from a mitigation expert during the
> penalty phase of the trial. While we agree that many of the
> statements made by the expert did not cast Carter in a positive
> light, the testimony, when considered in its entirety, demonstrated
> that Carter had lived, at times, a painful and tragic life. Defense
> counsel obviously hoped that such information would convince the
> jury that Carter's actions were a result of social and mental
> problems that he had experienced during his life.

*Carter*, 1993 WL 512859 at *16.  The Supreme Court summarized this claim as "(3) counsel's

presentation of a clinical psychologist during the mitigation hearing whose testimony was mixed

in nature and included recitation of facts prejudicial to Carter," but it found neither deficient

performance nor prejudice within the meaning of *Strickland*.  *Carter*, 72 Ohio St. 3d 545 ¶ 29

(1995).

       These conclusions of the Ohio courts are not contrary to clearly established Supreme

Court precedent:  both opinions cite to the correct standard for ineffective assistance of trial

counsel claims from *Strickland, supra*.  That standard is familiar:

> A convicted defendant's claim that counsel's assistance was so
> defective as to require reversal of a conviction or death sentence
> has two components.  First, the defendant must show that counsel's
> performance was deficient.  This requires showing that counsel
> was not functioning as the "counsel" guaranteed the defendant by
> the Sixth Amendment.  Second, the defendant must show that the
> deficient performance prejudiced the defense.  This requires
> showing that counsel's errors were so serious as to deprive the
> defendant of a fair trial, a trial whose result is reliable.  Unless a
> defendant makes both showings, it cannot be said that the

> conviction or death sentence resulted from a breakdown in the
> adversary process that renders the result unreliable.

*Strickland,* 466 U.S. at 687.  In other words, to establish ineffective assistance, a defendant must

show both deficient performance and prejudice.  *Berghuis v. Thompkins,* ___ U.S. ___, ___, 130

S.Ct. 2250, 2255 (2010), *citing Knowles v. Mirzayance,* 556 U.S.111 (2009).

      With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly
> deferential. . . .  A fair assessment of attorney performance requires
> that every effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's challenged
> conduct, and to evaluate the conduct from counsel's perspective at
> the time.  Because of the difficulties inherent in making the
> evaluation, a court must indulge a strong presumption that
> counsel's conduct falls within a wide range of reasonable
> professional assistance;  that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged action
> "might be considered sound trial strategy."

466 U.S. at 689.

      As to the second prong, the Supreme Court held:

> the defendant must show that there is a reasonable probability that,
> but for counsel's unprofessional errors, the result of the proceeding
> would have been different.   A reasonable probability is a
> probability sufficient to overcome confidence in the outcome.

466 U.S. at 694; s*ee also Darden v. Wainwright*, 477 U.S. 168, 184 (1986), citing, *Strickland,*

*supra*.; *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998), citing, *Strickland, supra*; *Blackburn v.*

*Foltz*, 828 F.2d 1177, 1180 (6th Cir. 1987) quoting, *Strickland,* 466 U.S. at 687. "The likelihood

of a different result must be substantial, not just conceivable."  *Storey v. Vasbinder*, 657 F.3d

372, 379 (6th Cir. 2011), *cert. denied,* ___ U.S. ___, 132 S.Ct. 1760 (2012), *quoting Harrington*

*v. Richter*, 562 U.S. ___, ___, 131 S. Ct. 770, 792 (2011).

Additionally, Carter has not shown an objectively unreasonable application of *Strickland*. Of course, one would prefer that a defense psychologist not mention torturing animals or bullying conduct, but how is a lawyer to use bad childhood experiences to mitigate a murder without allowing the psychologist to testify to the other bad consequences of those experiences in a defendant's life?  If the comments appear in a written report of Dr. Chiappone, it would certainly be better to have them come out as part of an uninterrupted narrative on direct than to have them come out on cross and to appear to have made an attempt to hide them.  Expert witnesses must be permitted to testify to the results of applying scientific method, not to results dictated by the needs of the case.  Compare *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  And of course having Dr. Chiappone testify as to the bad childhood experiences has these events coming from an outside expert rather than from family members, whom a jury might suspect of bias.

As the Supreme Court wrote last year in *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770 (2011):

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under [the] AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams, supra*, at 410. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
> …
> If this standard is difficult to meet, that is because it was meant to be. As amended by [the] AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf. *Felker v. Turpin,* 518

24

> U.S. 651, 664 (1996) (discussing [the] AEDPA's "*modified res judicata* rule under § 2244). It preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary correction through appeal. *Jackson v. Virginia,* 443 I.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.

*Id.* at 785-87. The Ohio courts' conclusion that it was not deficient performance to present Chiappone's testimony, considered as a whole, is not an objectively unreasonable application of *Strickland*. Therefore that portion of Ground Twenty-Eight for Relief which complains of the presentation of Dr. Chiappone's testimony is without merit and should be dismissed with prejudice.

**Merit Analysis of Claimed Ineffectiveness in Failure to Call Carter's Mother as a Mitigation Witness**

The second remanded issue is whether trial counsel were ineffective in failing to call Carter's mother, Desa Spaulding, during the mitigation phase of the trial. Although this claim was presented on direct appeal, the Court of Appeals held it could not adequately adjudicate the claim with no record of what the testimony would have been. *Carter*, 1993 WL 512859 *16. In post-conviction, her affidavit was presented, but the Court of Appeals found "[t]he essence of her proposed testimony regarding Carter's developmental, educational, interpersonal, and substance-abuse problems was presented through Carter's unsworn statement and the testimony of other mitigation witnesses." *Carter*, 1997 WL 705487 at *7. The court then denied the ineffective

25

assistance of trial counsel claim. *Id.*. Because this is a merits decision by the Ohio courts, Carter must show it is an objectively unreasonable application of *Strickland* (28 U.S.C. § 2254(d)(1)) or based on an unreasonable determination of the facts in light of the evidence presented in state court (28 U.S.C. § 2254(d)(2)).

In his Post-Hearing Brief on the Merits, Carter's argument on this remanded issue is, in its entirety, as follows: "Petitioner's mother was not called to the stand although she stood ready to appear. (Post-conviction Petition Exh. C.)." (Doc. No. 124-2, PageID 190.) This argument does not contribute to the 2254(d)(1) or (d)(2) analysis.

Considered without the benefit of any argument from Petitioner, the Magistrate Judge cannot conclude that the court of appeals' decision is not entitled to AEDPA deference. Although the court of appeals did not formally rule that Carter's mother's testimony would have been cumulative, Carter has offered this Court no demonstration that the Court of Appeals was wrong in concluding the evidence she would have given had been admitted through other witnesses.

In her affidavit, Ms. Spaulding testified that if counsel had called her as a witness during the mitigation phase of trial, she would have testified that: (1) although Carter suffered from mental deficiency, in particular a low I.Q., while living in Selma, Alabama, he was always an average or better student in school; (2) after he moved to Cincinnati, Ohio, Carter began using and selling crack cocaine; (3) she continuously complained to the judges of the juvenile court that Carter was using drugs and "running around with older guys"; (4) she asked the judges for help and asked that they "lock him up if necessary" but they refused to do anything to help; (5) she asked Carter's teachers at Taft High School to help "make his [sic] stop using drugs and to go to school"; (6) she called the police many times requesting their help in getting Carter to stop

using and selling drugs and they would speak with him on occasion but would not do anything else; (7) on one occasion, Virgin Simms [Virgil Sims], who was jointly indicted with Carter, came to her house and she ordered him to stay away and told him that if he didn't stop associating with Carter she would call the police; and (8) on or about January 6, 1992, prior to Carter's trial, she applied on his behalf for Social Security Supplemental Income benefits on the basis of his mental deficiencies and physical problems and on July 30, 1992, he was awarded Social Security benefits. (Return of Writ, Doc. No. Doc. No. 2, Exs. K and C.)

During the mitigation phase of trial, Richard Spaulding, Ms. Spaulding's boyfriend[5] at the time, testified that that he had known Carter for about three years, Carter had lived with him and Ms. Spaulding off and on for about a month or two, they ate breakfast together, watched television, he took Carter with him on his part-time janitorial jobs, Carter was a good worker, and that he did not discipline Carter because he didn't think he had the right to do so. Transcript of Proceedings, Volume VII, at 1153-59 ("Trial Tr."). Mr. Spaulding also testified that when he first met Carter he was fifteen or sixteen years old, at the time he (Mr. Spaulding) did not think that Carter was using drugs and just found out recently that he had been using.  Mr. Spaulding tried to tell Carter right from wrong and he did not "step into their affairs too much because [he] did not know that much about drugs or nothing like that or what he was into", his (Mr. Spaulding's) rule was that Carter had a certain time to be home because Mr. Spaulding did not believe in staying out late and coming home late at night.  Carter's relationship with his father was not very friendly.  Carter and his brother seemed to have a loving relationship but they had their ups and downs.  Carter and his sister seemed to get along "real good", and that he and Carter occasionally drank beer together. *Id.* at 1160-63. Mr. Spaulding testified further that Carter's mother tried to get him into treatment programs and she "had somebody or SSI or

---

[5] Although they share the same surname, he is referred to in the record as her boyfriend.

somebody like that" but that he didn't "know too much about that", and that Carter had a bit of a temper. *Id.* at 1167-71.

Carter himself made an unsworn statement at the mitigation phase of his trial in which he said that he was a "well-raised boy by [his] mother", he was a drug addict, and that he read the bible every night. *Id.* at 1172-74[6].

As noted above, Dr. Chiappone testified at length at Carter's mitigation hearing.

Ms. Spaulding's proposed testimony included information about Carter's upbringing, his developmental, educational, and social problems, his substance abuse, and the fact that she had applied for Social Security benefits on his behalf and that he was subsequently awarded those benefits. However, the Court's review of Mr. Spaulding's testimony and Dr. Chiappone's testimony as well as Mr. Carter's unsworn statement reveals that those witnesses testified about the issues Carter alleges Ms. Spaulding she would have testified about had counsel called her as a mitigation witness. For example, Mr. Spaulding testified about Carter's relationships with his father, brother, and sister, Carter's drug use, Ms. Spaulding's efforts to get Carter into treatment, and about Ms. Spaulding's involvement with SSI on Carter's behalf. Additionally, Carter spoke about his being a drug addict. Finally, Dr. Chiappone testified at length about Carter's upbringing, his developmental and educational backgrounds, his mental and learning disabilities, his relationships with his father and siblings, his drug addiction and the effects thereof, and his social skills. In other words, the information that Ms. Spaulding would have testified about was presented to the jury during the testimony of Mr. Spaulding and Dr. Chiappone as well as by Carter in his statement to the jury. In light of that fact, there is nothing that Ms. Spaulding alleges she would have testified about that was not presented to the jury. Under these circumstances, Carter has not shown that the Court of Appeals' decision on this remanded issue is not entitled to

---

[6] Carter had taken the stand during the guilt phase.

28

AEDPA deference under either § 2254(d)(1) or § 2254(d)(2). The claim should be denied on the merits.

**Merit Analysis of Claimed Ineffectiveness With Respect to the Transcript of Dr. Chiappone's Testimony**

As the Sixth Circuit read this claim, it "raises the issue of counsels' ineffectiveness leading to the exclusion of evidence from the mitigation stage and, specifically, the trial court's refusal to provide the jury with a transcript of Dr. Chiappone's testimony." *Carter v. Mitchell*, 693 F.3d at 569. Indeed, the Twenty-Ninth Cause of Action as pled says evidence was excluded because of trial counsels' ineffectiveness. (Petition, Doc. No. 1, p. 46).

It is well established that a capital defendant has very wide latitude in presenting mitigating evidence. *Lockett v. Ohio*, 438 U.S. 586 (1978); *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). Carter expressly cites Lockett in the Petition (Doc. No. 1, ¶ 144). But there was no exclusion of Dr. Chiappone's testimony from here. It is very clear from the state court record that no proffered testimony of Dr. Chiappone was excluded in the sense that the jury was permitted to hear his oral testimony, along with all the other oral testimony at trial. But *Lockett* has never been extended to hold that a defendant is entitled to have any portion of the mitigating testimony transcribed and provided to the deliberating jury.

Judge Nadel did not exclude any of Dr. Chiappone's proffered testimony. What happened instead was that, after retiring to deliberate, the jury asked for a transcript of Dr. Chiappone's testimony and Judge Nadel declined to provide the transcript. *Carter*, 1993 WL 512859 at *11, quoted *supra* at p. 8. On direct appeal Carter raised this as a claim of trial court

error, not ineffective assistance of trial counsel. *Id.*; *Carter*, 72 Ohio St. 3d 545 at ¶¶ 34-35. In post-conviction, Carter again presented this as a claim of trial court error, not ineffective assistance of trial counsel. *Carter*, 1997 WL 705487 at *4-5, quoted supra at 9-10. The Sixth Circuit decision neither cites nor quotes any place in the state court record where this claim was raised as a claim of ineffective assistance of trial counsel. Nevertheless, the majority opinion in the Sixth Circuit rules that this claim was fairly presented as a claim of ineffective assistance of trial counsel and our duty on remand is to obey the mandate.

Because the state courts did not address this as an ineffective assistance of trial counsel claim, there is no state court decision directly in point to which AEDPA deference applies. The findings by the state courts on the underlying facts do not suggest that any error by counsel played a part in Judge Nadel's decision not to provide the transcript, nor do they suggest that there was some deficient performance of trial counsel that could have somehow supported that decision. Rather, the state court decisions on this claim, both on direct appeal and in post-conviction, note the usual rules in Ohio for not reading portions of trial testimony back to the jury, much less stopping deliberations to have a transcript prepared.

Moreover, the Ohio courts noted Carter's complaint about the content of Dr. Chiappone's testimony and wondered about the inconsistency between that content and still wanting the jury to have the testimony in writing. Provided with a transcript of Dr. Chiappone's testimony, the jury might well have focused on the negative aspects of that testimony complained of in Ground Twenty-Eight (e.g., bullying women, torturing animals). There is no showing that trial counsel failed to support the jury's request for the transcript. And there is certainly no showing of prejudice from the failure to provide the transcript since the jury foreman did not testify at his post-conviction deposition that seeing the testimony would have changed his vote. *See Carter*,

1997 WL 705487 at *5.

A review of the trial transcript reveals that initially some of the jurors had difficulty hearing Dr. Chiappone's testimony. See, *e.g.,* Trial Tr. at 1179 (Defense counsel to Dr. Chiappone: "Some of the jurors are having trouble hearing you."); 1182 (Defense counsel to Dr. Chiappone: "…it's very hard to hear you. Maybe if could you hold the microphone in your hand."); *Id.* (Court to Dr. Chiappone: "… If you would hold the microphone. Could you hold it in your hand and speak closely into it, Doctor?"). Indeed, at least once, defense counsel asked that Dr. Chiappone repeat his testimony. *Id.* (Defense counsel to the court: ("… I notice [a] Juror … could not hear and raised her hand. Maybe if Dr. Chapone could start back at the family history that would be helpful."). Later during defense counsel's examination of Dr. Chiappone, the court again asked that Dr. Chiappone speak up. *Id.* at 1189 (Court: "Doctor, you will have to speak up. You could do that. Just speak right into the microphone and raise your voice. … It's not that difficult. … Keep the microphone up here and speak into it."). A review of the transcript reveals that there were no further discussions or instructions regarding the jury's ability to hear Dr. Chiappone's testimony. *Id.* at 1190-1229.

The trial record reveals that the jury retired to begin its penalty phase/mitigation deliberations on Monday, July 13, 1992, at about 4:20 p.m. and that at about 6:40 p.m. the court released the jury for the evening.[7] *Id.* at 1310-11; 1311-12. The jury resumed it deliberation at about 9 a.m. on Tuesday, July 14, 1992, and at 2:45 p.m., the court had the jury brought into the courtroom and the court advised the jury as follows:

> We interrupted your proceedings and deliberations because you
> indicated we [sic] would like a transcript of the testimony of the
> psychologist.

---

[7] The record reveals that while the court released the jury for the evening, the jury was in fact sequestered. See *Id.* at 1311-12.

> And in response to that, ladies and gentlemen of the jury, our policy is that the proceedings from which this testimony came from is a sentencing proceeding which was a relative short proceeding and, therefore, our policy is not to give you or reread testimony.
>
> The reason is it emphasizes – first of all, it was a short proceeding. It took place on Monday a short time ago and, secondly, it places unfair emphasis to you on one part of the testimony as opposed to another.
>
> So for that reason I will not reread the testimony.
>
> So with that we will send you back to the jury room and ask you to resume your deliberations until you have arrived at a jury decision. Thank you very much.

*Id.* at 1313-14. The jury continued its deliberations at 2:57 p.m. and deliberated until 4:40 p.m. at which time the court again released the jury for the evening. *Id.* at 1314-16. The jury again resumed deliberations on Wednesday, July 15, 1992, at 8:30 a.m., *Id.* at 1315, and advised the court at about 2:10 p.m. that it had reached a verdict. *Id.* at 1317.

First, Mr. Carter's position that because the jury had difficulty hearing Dr. Chiappone's testimony, it is likely that the jury remembered primarily the negative aspects of Dr. Chiappone's testimony, but that if the jury had been provided the requested transcript, it would have been able to review the more favorable aspects of Dr. Chiappone's testimony is pure conjecture.

Second, the trial transcript does little, if anything, to support Mr. Carter's argument. While it is true that the jury apparently initially had difficulty hearing Dr. Chiappone while he testified, counsel as well as the trial judge apparently remedied that situation. Specifically, Dr. Chiappone's testimony is approximately fifty transcript pages in length. Trial Tr. at 1178-1229. The record reflects that the jury's difficulty hearing Dr. Chiappone occurred sporadically during the initial phase of his testimony. See *Id.* at 1179-89. Further, the record reflects that Mr. Carter's counsel asked Dr. Chiappone to repeat those initial portions of his testimony that the jury

indicated it had difficulty hearing. *Id.* Additionally, there is nothing in the transcript that indicates that the jury requested a transcript of Dr. Chiappone's testimony because they could not hear that testimony. *Id.* at 1313-14.

Third, Mr. Carter has simply failed to show there is a reasonable probability that the result of the mitigation phase of his trial would have been different had counsel insured that the trial court provide the jury with a transcript of Dr. Chiappone's testimony. Stated differently, Mr. Carter has failed to establish the second, or prejudice prong of the *Strickland* test.

In sum, Carter has not shown that whatever his trial counsel did or did not do with respect to the provision of a transcript to the jury was deficient performance under *Strickland* or resulted in any prejudice, as that term is understood in the *Strickland* jurisprudence.

### Conclusion

It is therefore respectfully recommended that the Court deny habeas relief on all three of the remanded issues.   However, because the Sixth Circuit found these issues sufficiently arguable to merit remand, a certificate of appealability should issue as to all three.

January 14, 2013.

s/ *Michael R. Merz*
United States Magistrate Judge

## APPENDIX

### f. Twenty-Eighth Cause of Action:

Appellant's sentence of death is void or voidable because he was denied effective assistance of counsel in the preparation and presentation of the mitigation phase of his capital trial in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The Sixth Circuit Court of Appeals reversed a death penalty sentence when it found that counsel had made virtually no attempt to prepare and present effective mitigation at the sentencing phase of the trial. *Glenn v. Tate*, 71 F.3d 1204 (CA6. 1995). In a matter remarkably similar to the matter under consideration, the circuit court recognized that "it was obvious, or should have been, that the sentencing phase was likely to be "' the stage of the proceedings where counsel an do his or her client the most good. In Glenn, counsel failed to make any significant preparations for the sentencing phase. This was particularly egregious because there was a significant medical history which showed that Glenn had a neurological brain impairment. Since Glenn's counsel failed to make any preparations for the sentencing phase until after the guilty finding, the court found such inaction to be objectively unreasonable. To save the difficult and time consuming task of assembling mitigation witnesses until after the jury's verdict in the guilt phase almost insures that witnesses will not be available." *Citing Blanco v. Singletary*, 943 F.2d 1477, 15012 (CA11. 1991), cert. denied, 504 U.S. 943 (1992). The court found that only one of Glenn's attorney's did any preparation at all for the mitigation phase, and his efforts were largely misdirected. He attempted to prepare a video tape which fed to show a day in the life of the defendant. 125. The trial court held such evidence to be inadmissible, so that in fact very [sic] little if any mitigation was presented. The Court concluded that there was wealth of evidence present which showed Glenn's brain damage, his unfortunate proclivity to follow, and the numerous individual's who were willing to come forward on his behalf. The similarities to Carter's case are striking. Trial counsel's initial error in the matter at bar, was the failure to obtain a mitigation expert. Instead, counsel requested the appointment of a psychologist from the local court clinic, Dr. David Chiappone, who admittedly had virtually no experience in the preparation and presentation of mitigation material in a death penalty case. (Sentencing Hearing p. 1217). Furthermore, Dr. Chiappone's report and the reports prepared concerning the NGRI plea were shared with the prosecution giving

them a road map of the defense mitigation case. Appellate counsel Boyd testified that it was wrong to have the mitigation records turned over to the prosecution. (Evid. Hrg. TR. p. 22). Boyd further testified that he had no strategic reason for failed to assert a claim on appeal that trial counsel were ineffective for acquiescing in a procedure that let the prosecution get all of the mitigation evidence (Evid. Hrg. TR. p. 23). Attorney Hust testified that the disclosure of mitigation evidence to the prosecution prejudiced the defense. (Evid. Hrg. TR. p. 91).

As the records submitted at the evidentiary hearing make abundantly clear Dr. Chiappone simply scratched the surface of what should have been presented. It is Attorney Boyd's opinion that Dr. Chiappone did not act as a mitigation expert.   (Evid. Hrg. TR. p. 17).

Petitioner's history disclosed that he is borderline mentally retarded.   (Sentencing Hearing p. 1199). Furthermore, Dr. Chiappone opined that Petitioner had had a number of head injuries which led him to believe that there may have been a neurological impairment. "I think we have to raise the issue of organic involvement meaning some dysfunction in the brain that is not entirely clear what is going on." (Sentencing Hearing p. 1203). Unfortunately, no effort was made to acquire a cat-scan or other neurological examinations to present the existence or nonexistence of an organic reason for Petitioner's behavior.  Petitioner's school records from Selma, Alabama were partially made available to Dr. Chiappone. These records disclosed that national testing had been performed on Petitioner. These tests serve as a strong history of a student's mental proclivities and accurately predict retardation, attention deficits, anti-social behavior and overall ability to learn. No expert in education was consulted or asked to interpret the scores available. Since these tests are nationally given, a local education expert would certainly have been available to discuss the interpretation of the scores.  Petitioner's formative years were spent in Selma, Alabama. No effort was made to talk with his teachers or the school officials to confirm the ongoing problems that he was experiencing. A wealth of information was available to be obtained from these individuals and telephone depositions could have been taken in order to preserve their testimony for the trial.

Another underlying theme in Petitioner's development was his addiction to drugs at a very early stage in his life. Although jurors may be familiar in a very general sense with the effects of cocaine on an individual, an expert in this area could have provided a more

35

thorough understanding of the impact of cocaine on this Petitioner. See, First and Second Causes of Action argued above.

While the trial was proceeding, Petitioner had a pending a Social Security claim. A social security claim would by necessity require a variety of physical and mental examinations in order for the claimant to obtain benefits. (Post conviction Petition Exh. B.). That document reflects that doctors and other trained personnel decided that Petitioner was disabled. Further, it reflected Social Security's understanding that his condition may not improve. It certainly would have been essential to the mitigation phase to provide this very valuable information to the jury.

Counsel for Petitioner admittedly failed to obtain psychiatric records for treatment that Petitioner had undergone as a child. (Mitigation Hearing p. 1197). Many of these records are contained in Volumes I and II of the materials submitted at the evidentiary hearing. Attorney Hust testified that there was no strategic reason for not raising a claim on appeal that trial counsel were ineffective when failed to present the psychological records in mitigation (Evid. Hrg. TR. p. 91). *See, also Williams v. Taylor*, 529 U.S. 362 (2000).

Petitioner's family was not called to the stand to recount to the jury the problems that he had had while growing up. To argue that such testimony would have been cumulative shows a lack of understanding for the process of mitigation.

Petitioner's mother was not called to the stand although she stood ready to appear.  (Post conviction Petition Exh. C.). Testimony during the trial reflected the existence of a sister and a brother as well. None of these individuals were called to plead for Petitioner's life or to explain his developmental years. Instead, counsel opted for a summary of interviews obtained by Dr. Chiappone and his assistant.  This sterile and disjointed approach to mitigation deprived the jury of a complete picture of the eitology [sic] of Carter's mental health.

Dr. Chiappone's presentation was less than effective. State appellate counsel Boyd testified " I would not have put on Dr. Chiappone" (Evid. Hrg. TR. p. 15).  On numerous occasions he had to be told to speak up so that the jurors could hear his testimony. (Mitigation Hearing, pps. 1182, 1189, and 1190). In addition, his testimony was extremely difficult to follow and his conclusions equally confusing.  (Post conviction Petition Exh. B. Statement of R. Michael Reinstatler, Juror Foreman).

Even if we assume that Dr. Chiappone's diagnosis of Petitioner as borderline mentally retarded, with possible organic dysfunction in the brain, substance dependent, and an anti-social personality were accurate, trial counsel did little to effectively present their underlying historical genesis to the jury. Attorney Boyd testified that it was his opinion that Trial Counsel should have followed up with an appropriate expert if Dr. Chiappone believed that Carter had some sort of brain dysfunction. (Evid. Hrg. TR. p. 16). Trial counsel should have investigated these issues with Petitioner's family members and friends to enable Dr. Chiappone to present his testimony in the best light possible. Similarly, Petitioner's mother should have been called and engaged in a lengthy conversation about her son's upbringing.

In addition, trial counsel gratuitously elicited information about Petitioner's dark side. Petitioner was revealed by his own witness to be abusive toward women, a bully who brutally imposed his will on those in the streets, a person who had difficulty controlling his anger, a person fascinated with guns, and finally as someone who tortured and killed animals. (Mitigation Hearing pps. 1191, 1193, and 1223). None of these details mattered as a matter of law. Disclosure of these tendencies could only have frightened the jury and justified their verdict. By providing this type of information, trial counsel for Petitioner included non-statutory aggravating factors to be considered by the jury.

Dr. Chiappone also disclosed that Petitioner engaged in self mutilation. (Mitigation Hearing p. 1193). Jurors weren't told that people who self mutilate may possess suicidal ideation and some believe that it may be indicative of sexual abuse as a child. None of this was addressed other than in cursory fashion at the hearing and certainly it was not a factor in Dr. Chiappone's conclusions.

Without the necessary testimony and background from friends and family members, the jury could only look to Dr. Chiappone for such information. As a result, Dr. Chiappone was not effective and was successfully attacked by the prosecutor. In its written opinion sentencing Petitioner to death, the court was less  than impressed with Dr. Chiappone's efforts. In one sentence the Court opines that while Petitioner's upbringing may not have been exemplary, it did not explain his later behavior in life. (Opinion of Judge Norbert Nadel p. 15).

In *Glenn* the Court noted that the reason for the paucity of mitigation evidence was the lack of preparation. The Court observed:

> The lawyers made no systematic effort to acquaint themselves with their client's history. They never spoke to any of his numerous brothers and sisters. They never examined his school records. They never examined his medical records(including an emergency room record prepared after he collapsed in court one day) or records of mental health counseling they knew he had received. They never talked to his probation officer or examined his probation records. And although they arranged for tests, some months before the start of the trial, to determine whether he was competent to stand trial, they waited until after he had been found guilty before taking their first step -- or misstep, as we shall explain presently – toward arranging for expert witnesses who might have presented mitigating evidence on John Glenn's impaired brain function.

In addition, Glenn's counsel did not seek to obtain defense experts of their own to present evidence of their client's impaired brain function. Instead, they allowed the court to appoint joint experts whose result were given to the jury. These reports were of no benefit to Glenn and went into the jury room without being questioned.

The Sixth Circuit held that no competent trial counsel would have allowed this to occur. If counsel had done their homework ahead of time Glenn's interests would have been better protected. Carter's case is no different.

All of the errors alluded to above more than meet the first prong of the *Strickland* test that counsel's performance was deficient. The combination and cumulative effect of these errors undermined the reliability of the death sentence imposed. Defense counsel's efforts undermined the process and severely reduced Petitioner s chances for a life sentence. This prejudice was sufficient to meet the second prong of the *Strickland* test. In sum, the total effort and presentation of defense counsel during the mitigation phase of this trial was ineffective under the *Strickland* decision.

### g. Twenty-Ninth Cause of Action

Appellant's death sentence is void or voidable because evidence which should have been presented to the jury was excluded due to

38

the ineffectiveness of trial counsel in violation of the Fifth Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The United States Supreme Court has consistently held fast to the theme that mitigating evidence should not be precluded. The Eighth Amendment requires that a capital sentencer "be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." *Jurek v. Texas,* 428 US 262, 271 (1976). *In Lockett v. Ohio*, 438 US 586, 604 (1978), the Chief Justice wrote that the Eighth Amendment and Jurek require, that the sentencer not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. As discussed in the Twenty-Eighth Cause of Action above, trial counsels' lack of effort in the preparation of the mitigation phase of the trial, excluded viable and effective information from being presented to the jury. Appellate counsel Boyd opined that the jury never had background information to provide context for Carter's behavior (Evid. Hrg. TR. p. 24-25). Attorney Hust testified that there was no strategic reason for not raising a claim on appeal that trial counsel were ineffective when failed to present the psychological records in mitigation (Evid. Hrg. TR. p. 91).

Where counsel has failed to conduct an investigation that would have uncovered records nightmarish childhood for use in mitigation proceedings they are ineffective. Williams v. Taylor, 529 U.S. 362 (2000). Where counsel has failed to investigate, research, or collect pertinent records regarding Petitioner's background or history for mitigation purposes and made no attempt to locate significant persons who could provide testimony regarding mitigating factors when available is not considered trial strategy but is instead, an abdication of advocacy. *Powell v. Collins*, 332 F.3d 376 (CA6 2003). For these reasons Petitioner's death penalty is void

(Petitioner's Trial Brief, Doc. No. 124, PageID 187-193.)

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).